We will hear from you, Mr. Chase, representing Scott Klinger. If the court please, I'm Kelton Chase, I represent Dr. Scott Klinger in this matter. I'm sure the court's keenly aware of the essential issues of the case. And I certainly appreciate the fact that we just have this opportunity to have a little argument. I realize it's not granted in every case. I would suggest to you that it's particularly salient in this case to clarify what is the law and with regard to whether you can keep a tenure-track professor at a public university who has a written contract from attaining the goals of being tenure-track. In this case... What do you mean by that? Well, Dr. Klinger... Once you're on a tenure-track, even though you don't have tenure, you can't... You operate the same as if you had tenure? No, sir, but you do have time. The reason you're put on tenure-track, of course, is because you've attained a certain status at the university. I know, but does that give you legal rights that you otherwise didn't have before you were on tenure-track? Yes. It gives you the rights to attain tenure. We're not contending here, Your Honor, that he's entitled to continued employment or that he's entitled to tenure, but he is entitled to the third-year review that the employee handbook that's subsumed into his written contract contains. He is entitled to the procedural rights that this court has endorsed in Whiting v. USM and Samuel v. Holmes, Mississippi Supreme Court, in Robinson and in Bobbitt. All those cases stand for the proposition that the procedural rights that are ingrained and subsumed into your written contract, you are entitled. What would those be? Well, in this case, the rights would be that you would have a reasonable opportunity to obtain tenure. And in this case, Your Honor, he was banned from the university on erroneous information that's certainly genuinely disputed, and indeed, ultimately, the university itself agreed that the claim made by this career student was inaccurate. And of course, the background of that, just very simply, was that a student had claimed or made a statement, didn't really file a claim, he made a statement that Dr. Klingler had expressed a conduct that allegedly indicated he would be violent, that he had never shot a student and never intended to, but he's thought about it, he's thought about it a lot. That's what he allegedly said. Keep in mind, the university a few months later denied, or at least agreed that he was not a threat, talking about my client, and that there was a . . . I'll tell you, it didn't show good judgment. Sir? It did not. If he said those statements, which the record seems to indicate he did, it was not good judgment. No, sir, he specifically denied . . . if I could, if I may, there's an eyewitness to the conversation, and she . . . Dr. . . . Ms. Davis, and she says he didn't say it. Dr. Klingler . . . I thought he admitted he said something to that effect with mitigating effects. He had made previously . . . they had compartmentalized, if you will, statements. He had said once, years ago, that he had never shot a student speaking whimsically for disagreeing with him. That's a completely different kettle of fish than taking that to another point. Now what . . . but the point, of course, from a legalistic perspective we're making is that due process kicks in from the moment that he's going to be kept from having his written contract adhered to. In this case, and it's very important, he had a written express contract. It said what? Well, the contract essentially gave him employment until June of the following year, and then though . . . Unconditional appointment? The conditions are contained in the employee handbook. That's why the employee handbook becomes important. So it was a conditional appointment? What were the conditions on the appointment? They were not . . . They were contained in the handbook. Now, if he's got a contract that says as long as you abide by the handbook, you will have an opportunity to be considered for tenure, I guess. Well, absolutely. It's not unconditional. They don't just say you have an absolute . . . I mean, an absolute right. What if they had just decided not to turn . . . not to renew his contract at the end of the year? I'm sorry? What . . . I mean, they didn't terminate him. He did . . . he got paid. He was paid. And they just didn't renew . . . and they didn't renew his contract? Correct. So even if we give him a hearing now, what . . . where does that get him? Well, it gets him an opportunity to establish the criteria for being tenured, for one thing. And second of all, it gives him the opportunity to refute the charge that was made against him. And I use that term loosely because one of the points was, he kept trying to find, was the university making an accusation against him? And never once, upon repeated request, did they ever tell him what he was being accused of. I thought they gave him the witness's statement and . . . Yes, ma'am. They did give him a statement that emanated from the student. And I kept asking in my letters and the exhibits show, what does the university . . . what's the university's position? And the university never, literally never, would say what the university as an entity was stating. And indeed, the precipitating incident, quote, unquote, as of about three months after this alleged statement, which was denied, was made, the university concluded that this statement was vacuous and certainly harmless. But they decided not to hire him again the next year. He doesn't have the right to be hired the next year. Yes, yes, ma'am. I'm not suggesting that. What I'm saying . . . That's what my point is. I mean, maybe they believed him and they just said, you know, this guy's trouble. He's a troublemaker, even though we don't think he's a threat. We don't want to hire him for the next year. They have that right, don't they? I would respectfully disagree with that, ma'am. I would suggest to you that he has a right to a due process hearing right then and there as to the incident. And it's important that none of this would have come up . . . He has a right to a hearing, to a due process hearing. Yes, sir. But then if the . . . that does not bound or does it bind the hearing officer or the hearing group, board, whoever it is, to reach any particular result. They can hear him out and just kick him on out as if he had not had a hearing. What would prevent them doing that? Well, that would be conjectural, Your Honor. They also had the right to disbelieve any accusation that has occurred. So, I mean, all he has is a right to a hearing before they put him out. But they never . . . he never got that. And, in fact, not only did he not get it, it was a year and a half before even the President ever made a decision. And under the Gibson case and a number of cases emanating from this Court, to have due process, in fact, the entity has to move with alacrity and assiduousness and diligence quickly. They could have had a hearing within days after this. He also filed a grievance that, in the Whiting case, this Court has concluded, that those procedural rights attained. Now, what would have occurred at those rights, we would have to speculate. But we wouldn't have to speculate that if the . . . that he had the rights to disavow what was said and maintain and clear his name. One of the other salient aspects of this case is that he asked for a name-clearing hearing. All right, now tell me how his name was impugned. What kind of conduct was engaged in by the university or any of its agents that impugned his integrity? All of those . . . all of . . . first of all, he was literally marched out of the campus by two armed policemen in public view of the entire university. Second of all, the university representatives, to include Ms. Davis and even the student, Mr. Hand, it was, quote, the talk of the campus, unquote. Third of all, one day Dr. . . . That doesn't get you anywhere, really. If they did not specifically disseminate it, does it? You sued two particular defendants in this case. But the defendants didn't take any proactive measures to protect the privacy and protect the good name of Dr. Klingler. In fact, if the court . . . I mean, how could they have done it whenever you had the information that was already disseminated by the student and by the . . . according to what you said, it was about their marching out with the armed guards. Well, they shouldn't have done that. I mean, they could have done it, but . . . Did these two defendants have any role in sending the armed guards to take him out, escort him off the campus? They ratified the conduct, Your Honor. They allowed . . . How did they ratify? Sir? How did they ratify? Well, they were keenly aware, especially the provost, Dr. Lyman, was aware of how Dr. Klingler was being treated. He knew that Dr. Klingler was being arrested. All of this . . . this occurred . . . the problem with this case is it occurred from the top down as opposed to the bottom up. And it occurred by the president and the provost insisting that no due process would be allowed. And I would like to . . . on due process, if I could very quickly say, the university attorney, as we said in our brief, there really shouldn't be . . . I would respectfully submit an issue as to whether he was entitled to due process because the university attorney, as the evidence shows, agreed that he was entitled to due process. And, indeed, they wanted him to waive rights, quote, unquote. There really has never been, or shouldn't be, I shouldn't say there's never been . . . What exactly do you want us to do? I would ask that the case be reversed and remanded so that the jury could determine whether or not he was, in fact, provided due process. I mean, it does prevent . . . Let's assume that he was not provided due process. What's the relief that the federal court is going to give you? Well, first of all, I think the jury should determine whether he's entitled to monetary relief or not. And under Will v. Michigan, he's entitled to prospective injunctive relief. He could be returned to the university and be allowed to have the opportunity to have a hearing there, if you will, and be allowed to have an opportunity to satisfy the criteria for tenure. The university is bounded by the one-year contract. And he's a year-to-year employee, a very common arrangement. And for no reason at all, at the end of the year, they just say, we're not renewing the contract. If nothing had happened, and they just said, I'm sorry, or just said, your contract next year will not be renewed, period, then he would have no . . . that would end it, wouldn't it? Your Honor, I would submit that that . . . Now, I'm just trying to define what he . . . put aside this incident. Assume nothing happened. Yes, sir. But then, for whatever reason, they don't tell him why. He gets a letter from the provost, whomever, and says your contract will advise you that your contract the forthcoming year will not be renewed, sincerely yours, period. What right, if any, does he have? I think that takes us to the employee handbook, Your Honor, where, at a minimum, the handbook is subsumed into the written contract. And that handbook specifically gives him three years, not just one, to decide whether he's . . . and the verbiage that emanates from the handbook is, have you made substantial progress towards tenure? I mean, the issue that we're accentuating here is . . . The handbook says that, but I guess I'm trying to square that. I'm trying to understand the arrangement. Maybe . . . I understand year-to-year to mean that, at year end, they don't have to renew, and it's virtually an at-will employee. If you're saying no, the year-to-year means something more than that, contractually. All contracts, at all universities, at least public universities, they're handled with a one-year period, even tenured people. I understand that. I mean, they all are. They all, superficially, if you will, say that, Your Honor. But, in fact, you can't . . . and the reason I think this case is significant is really a concern about, if you will, having young professors come to universities, and they get a handbook and are told, we're going to give you . . . and what the handbook says, you're going to get six years to attain tenure, and we're going to check on it at the third year to see if you're making substantial progress. If those are simply disingenuous representations made and are meaningless . . . That doesn't mean, though, that they're not going to check on them earlier. I mean, you're saying that that limits, that they can do anything they want to for the first two years, and if they do well the third year and they're checked on at the end of the third year . . . No, Your Honor, but it doesn't . . . I mean, they cannot engage in any kind of, certainly criminal conduct or anything that . . . or misconduct of any kind of serious nature. Yes, sir, but he is entitled . . . because of the grievance procedure, we haven't discussed the grievance procedure. And under the grievance procedure, the reason that exists is to address issues such as that. The point would become, it keeps one from being characterized as a, quote, criminal, unquote, even though he never really was. It was intimated, but never really characterized that way. But he never engaged any misconduct. It keeps one from being ambushed, if you will, by any arbitrary action. And, of course, conceivably, that, if it was arbitrary and capricious, if it was done in a manner, in a willy-nilly manner, in which we say it was, that arguably does trigger a substantive due process. There would be absolutely nothing to keep the University, as I understand it, you can tell me if I'm incorrect about this, but nothing to keep the University if they had given him the hearing that you're requesting and terminated him and says, well, we don't accept this, we accept the word of the witness that said that you made these violent threats, and so you are terminated. That would have been the end of his legal road. Are you saying if that did occur? No, if it had occurred. If it had occurred? If he had had a hearing, the hearing you're claiming, and he had put on, and he had dozens of witnesses in his favor, and he had one witness that said, which he did, that said he said it, and the hearing board said, we believe that one witness, and you are out of here. There's nothing he could have done about it at that time. Well, I mean, he could have, what he could have, yes, sir, there is. What? He could have appealed it to the provost and then to the president. Okay, and they could have confirmed, and they can confirm the decision that I just referred to, and there'd be nothing he could do about it, after he exhausted his administrative remedies. Well, if . . . Okay, you can think about that over and tell me in rebuttal about that. We move on now to Mr. Norton. Mr. Norton, you've saved some time for rebuttal, Mr. Chase. I first want to say it's a privilege and an honor to be before the Court today on behalf of the university, on behalf of Dr. Saunders, the former president, and on behalf of Dr. Norton. Why wasn't he entitled to the hearing that Mr. Chase is claiming he was entitled to? There are two different bases for that, Your Honor. One basis is that the hearing was provided, and it was provided by the university. Mr. Chase and his client decided not to attend. It was a grievance conference, a grievance hearing that was held June 22nd of 2011, and Mr. Chase had worked with the university council. The record is replete with the documents. There are probably a couple hundred pages of documents that were used at that time. Mr. Chase presented written documents but told his client not to appear. Mr. Chase didn't come. The morning of June 22nd, Rick Lambert was the attorney for the university at that time. He even sent an email to Mr. Chase and said, I know you said basically you're not coming, but we really think you ought to come, show up. He didn't show up. He didn't come, but he sent documents. What he did, Your Honor, is that he was trying to set the university up because he knew that the information that was presented clearly showed that the actions of the university were reasonable. I think it's important that when the— All right. What did the university do? They knew they had conflict in statements there. He said he didn't say it. You had witnesses that said he did make these violent remarks. Did you make any resolution of the discrepancy between the statements, or did you just say he didn't show up and consequently he's right to present his own version of the story? I can answer that, Your Honor, by going back in time. We'll go back to November 9th, which was the date that the statement was made to Mr. Hand, the graduate assistant. Mr. Hand then explained that he had been in active shooter training the week before with the professor. There had been shootings at the universities in Virginia. There had been shootings in Alabama, and the University of Southern Mississippi was training all of their staff and administrators to be on the lookout for anyone that said anything that might be a tip that there's conviction to be a shooting. Dr. Hand—Dr. Klingler was at that training. Mr. Hand was at that training. So in the morning of November 9th, when Mr. Hand was told by Dr. Klingler, where he said, I've never shot a student before, but what that student said does not bother me, but I've been thinking about it a lot, I'm thinking about it a lot, coupled with, as you see from the statement from Mr. Hand, the very agitated and very irrational behavior of Dr. Klingler that morning. Mr. Hand went to teach a class. He said Dr. Klingler walked back and forth in front of the door by his class. He felt very stressed from Dr. Klingler's actions, but active training, active shooter training told him report it. So he did. At that point, the university, the chair of the department, Dr. Norton, and Dr. Black were the dean of the department. They got several people together, and they said, what should we do? They had Mr. Hand come in and talk to them. He told them what he had been told. The provost, Dr. Lyman, was notified of it, and Dr. Lyman then said, I'm going to appoint an unbiased, uninterested party, Dr. Lipscomb, to investigate this. Dr. Lipscomb, on December the 6th, interviewed Dr. Klingler. Dr. Klingler at that time said, How long was this after the incident? From November the 9th to December the 6th. At that point, Dr. Klingler said, Well, I may have said that, but I was joking. It's like joking about hijacking a plane or bombing a plane. You don't joke on a college campus about shooting students. Well, with due respect. Well, the university took it very seriously. I understand. The investigation was conducted. I understand that. At that point, the version given by Dr. Klingler was different but very similar to what Mr. Hand had said. So the university then proceeded with notifying Dr. Klingler that he was to stay off campus. They were going to investigate him. And that notice was given what day? That notice was actually given November the 9th. And he was escorted off campus what day? November the 9th. And he was entitled to a hearing under the handbook within five days, right? At that point, we don't believe that he was entitled to a hearing on it. He was simply reassigned in the Dupree decision that was decided several years ago, Dupree v. USM. Reassigned with an escort? Sir? You reassign somebody, you march him off the campus with police? We simply walked with him off campus. It sounds like you overreacted the statement and the environment and thought this guy was a shooter. Safety of students and safety of the administration is a very high criteria for the university. Judgement on both parts. Yes, sir. So at that point, he was simply reassigned. As the Dupree decision says, that there is no protected property interest in teaching, it was the employment. He did have a one-year contract, as the court has pointed out. It was a contract, and the court has said in numerous cases that I know you're familiar with. What was he assigned to? Research. And where was he to conduct that research? From home. He was given his computer. He had access to it. There was reference made that he was not to contact students while the investigation was ongoing. What happened is that during the time, and the record has several instances of this, there was a comment that was made earlier that he may have been a troublemaker. Dr. Klingler had been reassigned in October from teaching face-to-face with students to just online classes. There had been other instances and other issues. When the investigation was ongoing, and we had the December, the Christmas break and things, when they returned from Christmas break, they found out that Dr. Klingler has posted a series of things on the Internet. He breached confidentiality. Our handbook has numerous instances that I could cite to you, but it talks about confidentiality. He breached confidentiality. If the court looked at the records at that point in time, Dr. Klingler is sitting on his Facebook post. Let's address this. How did he—tell me why you think he got due process and why you think he complied with the due process procedures in the handbook. Okay. He got due process because when you look at what the grievance requirements are, it requires that the chair of the department investigate. Dr. Norton investigated. She reports then to the dean of the department. If Dr. Klingler wants to have a grievance conference or hearing, that he can request it, and he did. When did he request it? February the 18th, 2011, which was the same date that he received the notices from Dr. Lyman. That's the first time you requested a hearing. Yes, sir. February the 18th. 2011. I thought there was something—I'm sorry, please. No, go ahead. I thought there was something in the—once there was some adverse action had been taken, you had to do something within five days. I don't believe that I'm familiar with that, Your Honor. He was simply reassigned. In the Dupree decision, it talks specifically about a very similar situation. The only difference was Dupree was a tenured faculty member versus a non-tenured faculty member here, but he was reassigned for research. And the reason he got all of the due process he would be entitled to on it is because after the dean investigated it, he was provided the information. There was a change in the NOAA protocol. Council opposite worked very closely with university officials and said, let's dispense with the regular rules. Let's just have one hearing and not go through all these little rules. The university said, all right, we're going to call it a global hearing because under the rules you're entitled under the grievance to have everything reviewed on the grievance conference. That was done on June 22nd. Dr. Klingler then said, I want an appeal. It went to the dean of the department, Dean Blackwell. Dean Blackwell then convened a college advisory council, a CAC, which is made up of different representatives. The record excerpt is 445 and 446. It's crucial because this is showing the process and showing the due process that he was provided. Those records show from the CAC, and this is dated August 3rd of 2011, that there were four issues that Dr. Klingler said, I'm aggrieved about. He said, I didn't get my annual review. Council opposite mentioned that. CAC says, we've investigated this. There's no indication Dr. Klingler submitted material for annual review. He just went home and didn't do anything. And they said, you're supposed to submit your materials. You didn't get an annual review because you didn't comply with what you're supposed to do as a faculty member. He said that he didn't get his pre-tenure review, the three-year review that was mentioned. The CAC looked at it and said that the CAC finds no indication that Dr. Klingler submitted the required dossier for review. Again, he didn't do anything. It's a two-page document. They looked at the four issues, the non-renewal of employment, and they said what the university did, and the court's familiar. He had more than two years, so in order to non-renew him, you have to give him reasonable notice. And because this occurred in November, he actually got to finish his year, 2010 and 11, and we paid him another full year, another 12 months after that, to continue doing research. The CAC committee said that they found that the university had complied with the policies and the procedures. Dr. Klingler appealed that. That appeal goes to the provost, Dr. Lyman. Dr. Lyman then convened a university advisory committee made up of representatives from all the different colleges. That committee reviewed it in December of 2011. Their decision came back and said, we reviewed all the records, we find compliance. At that point, Dr. Lyman is the provost. Dr. Klingler says, I want to appeal that. He then sends it to Dr. Saunders, who is the president of the university. The president of the university then, in her report, which she issued in June of 2012, said, I reviewed the records, I looked at this file, and I find that the decisions that were unanimous for the UAC, the provost, the CAC, the dean of the department, and the chair of the department were proper. That's why he got any due process. There's even a question whether there was due process that was required simply because the case law clearly shows that there was no deprivation of a property interest because his contract says, we will pay you to work at the university. The university can describe where he works and how he works. Dr. Lyman looked at it, and on February 18, 2011, said in his deposition, I looked at it, there was underperformance of instruction, which is a crucial criteria for a professor. He said that he was concerned about interaction with students, he was concerned over student safety, and he was concerned, Dr. Lyman said, I felt that his consummation conduct, his intentional disregard for the instructions of the university, was a crucial factor in determining that this was not a professor we wanted to stay around. Because they told him not to talk to anybody, he went out and talked. He goes to Facebook, he went to Forest General Hospital, and the police report is here, showing that he knocks on the door, there's a graduate student that's visiting her grandmother who's in the hospital, and he says, oh, I heard your voice, and she's concerned that she posted on Facebook she was going there, she's concerned he's following her. The record shows that she notified the hospital security to walk her to her car, then she notified the university police to tell them, I don't know what's going on, but this guy came up to the fifth floor of the hospital, knocked on the door where I'm visiting my grandmother, and tells me the university has told me I can't talk to anybody. When did this occur? December 30, 2010, during the time our investigation was ongoing, into the events. On January 13, he posted things on Facebook, Your Honor. Okay, now tie that in to this central issue in the case of denial of due process, which seems to be the central issue. How do you tie that in to the claims they're making? Well, Your Honor, first, as I said, as to due process, I don't think this has been a violation of a property right. There was no violation. He had a contract, and he continued, and we performed under the contract. He testified that he was doing everything under the contract. I was talking about that particular incident. How does that tie in? Is that relevant to anything? Did you just throw that out there, or what? It's relevant, Your Honor, as to the reason that they decided on February 18 not to renew his contract. It was this series of events. It wasn't one event. It was a series of events that occurred. There's been a claim that there should be a liberty interest or a name-clearing hearing. We see that, number one, that there was a hearing, that Dr. Klingler refused to come, his attorney refused to come. The District Court also pointed out that in the Nichols case, which is relying on Fifth Circuit law, that if there's a question about whether a name-clearing hearing is involved, there's a seven-part test. In this particular case, the very first test is referred to as the stigma infringement test. The first one was, was he discharged? He fails on the very first question. He was not discharged. This is simply a non-renewal of a contract. Well. Your Honor, we paid him for 18 months to do research, and then told him we gave him a contract on February the 18th. Whether it's a discharge or failure to renew, it seems to me the interests are essentially the same. But I guess maybe the legal rights aren't. I do think there's a legal distinction, Your Honor. Well, and if subsequent employers are going to look at his record and he was escorted by a guard off the campus in November and banned from returning to the campus ever again. I mean, yes, you paid him, yes, he could do research from a computer, but that's pretty close to a discharge. Your Honor, there's nothing in the record that we have that anyone would ever see that ever shows that. It's only from Dr. Klingler. He put it on Facebook. He held a sign up in front of himself that said USM and had a series of numbers, like in a convict, and posted it on Facebook. Assuming he hadn't done any of that, he's still barred from the campus, and the next university he goes to says, well, what did you do for the last year and a half? Well, I researched from my home with my laptop. So lots of university professors, they research. We didn't disseminate that information. Judge Jolly referred to that before. What did Dr. Lyman and Dr. Saunders say? What did they publicize? They didn't publicize anything. The publicity came from Dr. Klingler. He's the one telling everybody about what's going on. When was the first time that he made a broadcast of his situation on his Facebook? January 13, 2011. So from November 9 until then, he had not engaged in any kind of publicity of that. Your Honor, your question asked when did he first put it on Facebook. The first record that I have on Facebook was that date. We know that he told other students before that. We know on December 30 that he told the graduate student at the hospital those things. We were not out asking people to tell us what he's saying because it was a confidential investigation. And we simply have the right, Your Honor, not to renew a contract for a non-tenured professor, and that's all that we did. He filed a grievance, and we followed all of the grievance requirements in the faculty handbook. Sections 12.1, 2, 3, 4, 5, and 6 say what we're supposed to do, and we followed all of those. We did not follow all of those, Your Honor, to the extent that there are some deadlines in there. In the Dupree decision, the court specifically said that decisions concerning teaching assignment, pay increases, administrative matters, and departmental procedures, while extremely important to the person, do not rise to the level of constitutional deprivation. And to the extent that there were times that something may have said 10 days, and it took 20 days or 30 days, and we submit that that doesn't rise to constitutional deprivation of rights, and that some of that was caused because of intervention of counsel on it, but it's not a constitutional issue. And we found that the district court correctly identified those items. I see that I have one minute left. Are there any additional specific questions? I don't think so, Mr. Norton. We have your argument, and thank you very much. Mr. Chase, we'll hear from you next. If the court please, first on this research issue, the letter that ultimately terminated him of February of 2011 specifically said the research would be keyed to us providing you research topics. I made repeated requests, give us some research topics. He didn't even get that. He couldn't just go research on the meaning of life. He had to be given something, and he never was. I mean, and it's very important. I mean, the point becoming, with all due respect to Counsel Offset, it wasn't that he didn't provide anything. He wasn't given an opportunity to teach. The three areas are teaching, service, and research. How does that bear on the legal issues that you're arguing, though? Your Honor, because if I understood Mr. Norton, he was saying at one of the committee meetings about this that he didn't provide anything, and that's exactly our point. He was cut off from satisfying those three salient criteria completely. It was like saying, okay, if you accomplish teaching, service, and research and do a good job, you're going to be tenured if you meet our standard. He wasn't allowed to do that. We're not arguing about that, are we? I mean, it seems to me we're arguing about the deprivation of a hearing. We are, Your Honor. And not about whether he was or was not granted tenure and the merits of it and so on. No, sir, but we are contending, trying to, I won't say argue, but we're contending that he was not allowed the opportunity to attain and satisfy the criteria for tenure. That's the distinction between. No, no, no. We're not talking about that. We're talking about he was escorted off campus, and you say he was entitled to a prompt hearing after that. Yes, ma'am. And he got hearings. Now, the question is, why do you say what he got about the incident, not about whether he got the opportunity to research? I mean, they could have terminated him for cause, I would think. But in any event, he got hearings. Why do you say those were inadequate on the incident? Or multiple incidents, actually, following a student to a grandmother's hospital, other things. Why was the process he got not due process under the Constitution? Well, first of all, it wasn't done promptly. It was supposed to be the whole process. Well, it didn't meet the contract, maybe, but it did occur. Why was it? Give me your best case that said that the time that elapsed made it unconstitutional. Well, Gibson specifically says that due process has to occur at a meaningful time in a meaningful manner. And in this case, the only— He said you didn't show up. Your Honor? He says, he offered you that hearing. You didn't show up. And the reason we wrote and told the university, they stacked a deck, and those words were used. What they did, the very person who was going to have the hearing is the very accuser of Dr. Klingler. The chair of the department and the dean were predominant accusers of Dr. Klingler for doing wrong, and yet they were going to— Well, you could have at least had a hearing, and then you could object to the biased nature of the hearing. We did. And you didn't show up and present your man. But that wasn't the hearing, though, Your Honor, that was in play. That horse was out of the barn and in the pasture by that point. They're talking about a hearing in June of the following year and not in front of the president. I thought there was an opportunity in February of 2011. No, Your Honor. At that point, that's when they had written a formal letter terminating him and keeping him from— They had already banned him from campus the same day this alleged statement was made. I mean, he was done that day, period. And they knew full well as a matter of law and as a matter of equity and as a matter of simple decency, if you're going to accuse a professor of something like that, he's entitled to an immediate hearing. They could have had a hearing that way, and the handbook requires it, as Justice Owen pointed out. That's the issue, then, and that's the issue. We'll have to decide as to whether he got a due process hearing and whether it was timely. And if not timely, whether it violated his constitutional rights. And the name-clearing aspects as well are tied into it. The name-clearing aspects tie in from the Hall v. Trustees case and Roth that basically talk about stigmatizing him. That could have been done in the same hearing. It would have been done, I guess. I'm sorry, Your Honor. That could have been done in the same hearing and probably would have been done in the same hearing in terms of his termination. Well, the only reason is that those rights emanate, though, from cases. I understand, but I said it could be done at the same hearing. Yes, sir. Because, I mean, if he comes in and they say, this is the reason we fire him, and he says, no, it's not the reason we fire him, and he puts on his witnesses and his name is cleared from his witnesses' point of view and his point of view. Thank you very much. We have your arguments, and you certainly did not waive any arguments.